ON MOTION FOR REHEARING AND/OR CLARIFICATION AND MOTION FOR CERTIFICATION OF QUESTIONS OF GREAT PUBLIC IMPORTANCE

SHARP, W., J.
Slater has filed a motion for rehearing and/or clarification and certification of questions of great public importance,[1] after *619 this court per curiam affirmed the trial court’s order denying her motion for post-conviction relief. Slater entered no contest pleas to second-degree murder and first degree arson and was sentenced to concurrent 33 year sentences. We deny the motion but write to explain our reasons for doing so.
In her motion for post-conviction relief and in this motion, Slater argues her defense counsel, Ed Tilton, was ineffective for not fully advising her on the defense of Battered Wife Syndrome. Slater points out that she was examined by Dr. Legum, a psychologist, pursuant to a court-ordered evaluation sometime in January 2002. However, Slater claims Tilton had already advised her to accept a plea from the state and she in fact entered that plea in October 2001, before Dr. Legum completed his report. Without Dr. Legum’s findings, Slater argues it was impossible for Tilton to have knowingly advised her as to what defenses were available to her at trial.
Slater’s argument suggests Tilton was unaware of the defense of Battered Wife Syndrome or did not believe it would apply until Dr. Legum submitted his report. This was not the case. Slater was arraigned on June 13, 2001. Tilton filed a notice of intent to rely on the Battered Spouse Syndrome defense on July 2, 2001. Thus he clearly considered it a potentially viable defense.
However, Tilton’s primary motivation was to avoid the state seeking an indictment against Slater for first degree murder for the death of William Kimberly, a friend who was staying with the Slaters in their mobile home. Slater set the mobile home on fire and Kimberly, who was blind, died as a result. According to the fire and arson investigation, Slater confessed that she poured gasoline on a pile of clothes and set them on fire with a cigarette lighter. By the time she realized what she had done, the fire was out of control. Slater told deputies she was the cause of Kimberly’s death but that she did not mean to kill him.
The prosecutor sent Tilton a letter on August 10, 2001 which outlined his plea offer:
As I have previously relayed to the Office of the Public Defender, in this case, I will offer to let Ms. Slater plead *620 as charged and agree to a guideline sentence. No recommendation will be made other than the sentence be within the guidelines. Of course, the victim’s family will be allowed to speak to the judge and recommend an appropriate sentence. This offer has been approved by the victim’s family.
She will also waive any right to a bond pending sentencing.
This offer will expire after Pre-Trial on August 30, 2001. Otherwise, we will take this case before a grand jury and seek an Indictment for First Degree Felony Murder and First Degree Arson.
Slater entered her no contest pleas in October 2001. By the January 29, 2002 sentencing hearing, Dr. Legum had submitted his report and the judge had read that report. Tilton went over Dr. Legum’s report with Slater and had Slater testify as to the abuse she suffered over the years from her husband Adam. On the day of the fire, Slater said Adam was complaining she had too many clothes and she was going to burn them in the trailer. Slater admitted she did not know what she intended to do by burning her clothes. Slater denied she told a neighbor that she thought Adam was inside the house when she set it on fire.
Tilton also had Slater’s father, sister and daughter testify to Adam’s abuse of Slater. Tilton asked for the minimum sentence, arguing Slater was basically a good person who suffered years of abuse, as noted in Dr. Legum’s report.
Dr. Legum’s report outlined Slater’s history of alcohol use and abusive relationships, which included her two prior marriages. Dr. Legum also administered a psychological test battery, consisting of eight tests. As to Battered Spouse Syndrome, Dr. Legum concluded as follows:
The defendant’s account of her own life and her chaotic, turbulent relationship with her present husband constitutes a pattern which is often seen among persons who have been identified with the “Battered Woman Syndrome.” In this context, there are numerous overlapping indicants from this evaluation which suggests that the defendant insidiously developed what is referred in the psychological literature as “a learned helplessness syndrome,” i.e., a pervasive sense of her own inadequacy and incompetency and more critically her inability to rely upon the efficacy of her own behaviors. In this context, the Learned Helplessness model lends some insight into the paradoxical finding that so many battered women choose to remain with their violent spouses in spite of what may be many years of mistreatment, degradation, and overt violence, i.e., staying with the abusive husband, however unappealing, is a safer proposition than facing the unknown. Consistent with this dynamic, the defendant indicates that during the years in which she was physically abused by her first husband, that she would turn to her alcoholic mother for solace rather than contacting the legal authorities and that this marriage ended through the initiative of her first husband. In more recent years of her present marriage, Ms. Slater indicates she was able to report her spouse’s abuse to the authorities but at the critical moment would find herself not being able to follow through in filing criminal charges against him. The pathological admixture of her profound ambivalence about her husband and the marriage, in conjunction with her pervasive insecurities and self-doubt, is tellingly and poignantly reflected in the curiously dismaying disjunction of her efforts to characterize her husband as a caring and kind man while spinning off a litany of indignities, *621 perversities, and violence meted out by him as delineated above. In the opinion of this psychologist, the defendant cannot be considered to meet the criteria for the Battered Woman Syndrome defense because of her self-admitted state of intoxication during the critical period of time surrounding the events which led to her actions. While the defendant is seen as manifesting many of the classic symptoms of Battered Woman Syndrome, nevertheless, the disinhibitory influence of alcohol is thought to diminish the viability and credibility of the application of this syndrome to her case, i.e., her reckless, ill-conceived actions are seen as emanating from a fusion of her state of intoxication, her profound personality deficiencies, and her cumulative response of rage to the indignities and abuse forced upon her by her spouse ... (emphasis added)
At the post-conviction hearing, Tilton testified he felt Dr. Legum’s report weakened the defense of Battered Spouse Syndrome. Tilton also testified he “wasn’t confident that the jury would buy it, and basically [the prosecutor] had us in a position where you take this or it’s felony first degree murder, which is life without parole.”
Thus the record clearly shows that Til-ton was aware of the Battered Spouse Syndrome defense but did not think the jury would accept it and that his primary concern was to avoid a possible first degree murder charge.[2] Apparently a decision had to be made concerning the state’s plea offer within a specific time frame which was before the psychologist finished his evaluation. The evidence against Slater was substantial — she confessed to deputies at the scene, her clothes were taken into evidence, and she may have made a comment to a neighbor which indicated she knew someone was in the house. In addition, the victim was not Tilton’s allegedly abusive husband but was a friend and innocent victim who had never harmed Slater, thus rendering the defense of Battered Spouse Syndrome problematical at best.[3] In these circumstances, advising Slater about the state’s plea offer cannot be deemed ineffective assistance of counsel simply because that advice came before the psychologist finished his evaluation.
As it turns out, the psychologist concluded Slater did not meet the criteria for the Battered Woman Syndrome defense because of her self-admitted state of intoxication. Slater complains that Tilton never made any attempt to determine whether she was in fact intoxicated and, if so, to what degree. However, Slater admits she told Dr. Legum she was intoxicated at the time of the incident and she told deputies who were investigating the incident that she had been drinking beer throughout the evening.
Slater also claims she was coerced into accepting the plea because Tilton told her he would need an additional $25,000 to represent her at trial (a claim he denied at the post-conviction hearing) and her family had very little money. Slater did not raise this claim below and thus it is barred. Henyard v. State, 883 So.2d 753 (Fla.2004) (post-conviction movant’s claim on appeal was procedurally barred where such claim was not raised in post-conviction motion).
Slater next claims she understood she would receive a 23 year sentence if she *622 entered a plea and not the 33 year sentence she actually received. The court below found this claim was conclusively refuted by the record and the evidence supports that determination. At the plea hearing, the judge specifically asked Slater if she understood that any recommendation for a guidelines sentence was just that — a recommendation — and that any sentence — higher or lower — would be up to him. Slater responded that she understood.
Slater also points out her 33-year sentence for arson was illegal, the maximum being 30 years. The court below granted Slater relief on this claim and corrected the excessive sentence on the arson charge by resentencing her to 30 years.
Slater next claims the record contradicts Tilton’s claim he met with her numerous times. At the post-conviction hearing, Slater testified she only met with Tilton one time at county jail and a couple of times at the courthouse. In contrast, Tilton testified he spoke to or met with Slater 10 or 15 times, including four times for “concentrated” interviews. Slater did not raise any alleged failure of Tilton to devote enough time to her case and so the court did not resolve this conflict in the evidence.
In sum, the record does not support Slater’s claim the court below erred in denying her post-conviction relief or that this court overlooked any evidence in the record. The questions Slater proposes for us to certify do not involve issues of great public importance but rather assume facts not in evidence or misstate the facts in this particular case. In another case, any of the issues in these questions may support a claim of ineffective assistance of counsel. Unfortunately for Slater, she was unable to establish ineffective assistance in her case.
Motion for Rehearing and/or Clarification and Motion for Certification of Great Public Importance DENIED.
PETERSON and MONACO, JJ., concur.

. The four questions set forth in Slater's motion as being ones of great importance within the meaning of Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v), follow:
*619 1) When tried counsel files notice of intent to seek a defense of Battered Wife Syndrome, the court appointing a psychologist to evaluate the defendant towards this end, is counsel ineffective in advising that defendant as to her chances at trial so that she can make a voluntary and knowing decision as to whether to accept or reject a plea offer from the State where in return for her plea of guilty to all charges she would receive a "guidelines sentence” under the Criminal Punishment Code, when such is done before the psychologist has finished his evaluation and submitted his report? 2) Is a plea voluntary and knowingly made when a defendant faces a statutory maximum of 30 years on a charge, but the State, defense counsel, and trial court all mistakenly advise the defendant that she faces life in prison on that charge?
3) When the State offers a plea offer where a defendant pleads guilty to all counts as charged with the sole "benefit” offered by the State being that she would receive a "guidelines sentence,” this being under the Criminal Punishment Code, is this "benefit” in reality a penalty in that it precludes that defendant from receiving a downward departure sentence, an option that would be available if found guilty on all counts as charged at trial?
4) Can a claim that counsel misadvised a defendant as to accepting a plea which in fact had no benefit over going to trial, be overcome by a claim by the State that the . benefit the defendant received was that it could have charged that defendant with crime with a greater penalty when such a scenario was not a consideration when defendant made her decision to accept the plea.

. Slater admitted Tilton planned to use the Battered Spouse Syndrome as a basis to seek clemency.

. Slater admitted Kimberly had never done anything to her and in fact was a really nice man.